On an appeal from a decree of the Superior Court of Chancery for the Richmond District pronounced in September, 1802, by which the bill of the appellant was dismissed.
This was originally an action at law instituted in the District Court of Prince Edward by the appellee against the appellant, and was brought into the Court of Chancery by an injunction to the judgment of the said District Court.
The circumstances which gave rise to the original suit were these: John Johns was *260 high sheriff of Buckingham County for the years 1784 and 1785; one of his deputies was Peter May, who qualified in November, 1783, and gave bond to the high sheriff for the due execution of his office, with Charles May, John Benning, arid William Meredith his securities: in April, 1785, William May, brother of Peter, was on the motion of John Johns, the high sheriff, sworn and admitted his deputy; and as an indemnity to the high sheriff for the transaction of William May, his brother Peter (whose assistant he was) had previously, in Februarj', 1785, entered into a bond to the said high sheriff, with Archelaus Austin and John Cabell his securities: in August, 1785, the Commonwealth obtained a judgment against Johns, the high sheriff, for arrearages of taxes of 1784, who, on the 9th of June, 1788, obtained a judgment against Peter May, and his securities Charles May, John Benning, and William Meredith for the same, amounting to 4151. 13s. 5d. and 831. 10s. 9d. damages; to the rendition of this judgment, no objection was made by Peter May, or any of his securities; on the 11th of June, 1788, an execution issued upon this judgment, which was levied upon the property of Benning and several slaves of the estate of Charles May: these slaves were, through the means of Peter May, clandestinely removed to the state of North-Carolina, but were pursued by the sheriff, accompanied by John Ben-ning, brought back, and sold for the sum of 1981: about the same time, the whole of the slaves of Peter May and William Meredith were also removed to North-Carolina, leaving the whole burthen of the execution (except what had been raised by the sale of Charles May’s negroes) to be borne by John Benning; who petitioned the General Assembly for relief, and was allowed until September, 1790, to pay the principal and interest, the damages being remitted; Benning paid into the treasury '^the sum of 3181. 18s. besides having paid to individuals several other sums, which he alleged, were for the delinquency of Peter May.
In August, 1789, Benning instituted an action on the case, in the District Court of Prince Edward, against William Meredith, stating specially the undertaking for Peter May, on his exhibiting a sufficiency of property to indemnify his sureties; that a judgment was obtained by John Johns, the high sheriff, against the plaintiff, for certain nonfeasance and failure of duty by Peter May as his under sheriff; the amount of which judgment was paid by the plaintiff; and that he being about to sue and implead, and move against Peter May for indemnification, the defendant, not ignorant of the premises, but craftily, &c. intending to defraud and injure the plaintiff, “did secretly and maliciously take and carry away the slaves, horses, cattle, household goods, goods and chattels of the said Peter May, to parts unknown, and doth keep, secrete and conceal them, and also did then and there aid, assist and counsel the said Peter in removing himself to parts unknown, to the end that the plaintiff might be prevented from recovering indemnification as aforesaid;” by which removal, &c. the plaintiff was prevented from recovering the said sum of money, (the amount of the judgment) to his damage of 7001. At the District Court of Prince Edward held the 4th of June, 1791,. the Jury sworn to try the issue, (which was “not guilty,”) returned a verdict for the plaintiff, with 5001. damages: on a motion for a new trial, the Court took time till the next day to consider on it; and then, after “hearing the arguments of counsel, and mature deliberation thereon had, the motion for a new trial was overruled; but no exception was taken, or grounds stated for the application for a new- trial. In May, 1791, Meredith obtained from the Judge of the High Court of Chancery, an injunction to this judgment, stating a variety of matter to shew that the damages were excessive, and the demand of Denning overrated by the Jury; particularly that he had offered to pay Johns one-third of the judgment, if he would exonerate him, which he refused to do; that Charles May had removed all his slaves to North-Carolina, and there being a connexion between Johns and Ben-ning, he was apprehensive that it was the determination of Johns to enforce the payment of the judgment from him alone; to prevent which, he removed his slaves also to North-Carolina, together with several others which had been given by him in marriage *with his daughter to Peter May, but which were sold by the said Peter May to him in payment of a pre-existing debt for a tract of land ; that the slaves remained in North-Carolina only about five or six weeks, during which time the resolution of the General Assembly was obtained granting further time for the payment of the debt to the Commonwealth; that most of the defalcations of Peter May arose from the transactions of his brother William May, who was admitted a deputy by the high sheriff, and for whose conduct the complainant was not responsible. And by an amendment to the original bill he stated, that at the trial of the suit at law he was not prepared to shew that the whole of the slaves carried to North-Carolina, including those in the possession of Peter May were his own property, the charge in the declaration not being so precise and specific as to induce a belief that such proof was necessary.
The answer of Benning and Johns denied all the equity of the bill: the former expatiated on the injury to which he had been subjected in being compelled to sacrifice his property in order to meet the whole of the judgment: charged Meredith and his co-securities with injustice in removing their property beyond the process of the Courts of this Commonwealth, and stated that Meredith, so far from attempting to justify his conduct in removing the property, did not adduce any kind of testimony to prove that it was his own; and that the Jury, in estimating the damages, had, doubtless, gone on the idea that the fraudulent conduct of Meredith, in assisting Peter May to remove his property, had imposed the payment of the whole debt on the defendant, Benning.
The Chancellor, in November, 1791, dissolved the injunction; but, at a subsequent term, upon the coming in of additional *261 evidence, reinstated it, and directed a new trial of the issue at law ; which was had before the District Court of Richmond, in September, 1801. On this trial another verdict was found for Benning, with 4751. 6s. 8d. ■damages. John Johns, having several other demands against Peter May, for delinquency in office, brought suit against him and his securities, in Prince Edward District Court, and at the September term, 1793, obtained a judgment for 1031. Os. 9 l-2d. and costs; which judgment was founded on the award of Miller Woodson, Thomas Gibson, and Samuel Duval, to whom was referred the settlement of all matters in controversy between the parties in that suit.
*In September 1802, the Chancellor directed an account to be taken by a commissioner of the Court, and a report made of what was due from Peter May to John Johns, and of the payments in discharge thereof by his securities respectively. The commissioner reported the balance due on the several judgments of Johns against Peter May and his securities to be 6021. 4s. 7d. including interest; and from an examination of the account accompanying the award of the arbitrators in the last mentioned suit, and a comparison of dates, he inferred that although the arbitrators in their statement had taken into view the transactions of William May, the assistant of Peter, yet that from the late period at which he qualified, the first judgment obtained by Johns against Peter May, and his securities, must be considered the just sum for which they were responsible, at that time, and totally unconnected with the transactions of William May.
In September, 1802, the Chancellor dismissed the complainant’s bill, from which an appeal was taken to this Court.
Stuart, for the appellant. ' The following points will be relied on: 1st. It will be contended that the cause of action, as laid down in the declaration, if supported by evidence, is not sufficient either in a Court of Daw or Equity to justify the verdict and judgment rendered at law. The cause of action, it will be recollected, was, that Meredith had assisted May in the removal of his property to North-Carolina. If this point should be decided against us, we will secondly shew indisputably that the property carried to North-Carolina, did not belong to May but to Meredith; and 3dly, that the money paid by Benning was in his own wrong, as at the time of the payment May was not a defaulter for a single farthing. If all these points should be decided against us, we shall rely that Meredith should only be made liable for his proportional part, as a co-security; instead of which he has been made liable tor the whole. His taking his slaves to North-Carolina was only to avoid paying the whole debt; — he was always willing to have.paid his part.
As to the 1st point. It is contended that there is nothing in the evidence which shews any impropriety in the conduct of Meredith and May, in carrying the property to North-Carolina. It appears from the plaintiff’s own shewing in the declaration, that before there was *any judgment or motion in behalf of the high sheriff, Meredith assisted May in the removal of the property. Has not a person, before any restraining process has been issued against him, a right to remove his property from one place to another? Had there been an execution, or writ of ne exeat, it is admitted that it would have been a violation of the law. Is that old opinion to be revived, that a person assisting another to remove out of the Slate, is liable for his debts? But, if there was a right of action, it was not in Benning: he was a co-security, standing in the same situation as Meredith, and had not been made liable to pay any thing. But if the Court should think this point against us, we shall 2dly establish, that the property which was complained of as being removed, was, in fact, the property of Meredith, and that he had a right to remove it wherever he pleased. Erom the bill it appears, that in the year 1783, before May became a deputy-sheriff, or was incumbered at all, he made a purchase of Meredith of a tract of land to the amount of 5001. This fact is proved by three witnesses: it is also proved, by two other witnesses, that other parts of the account of Meredith against May, stated in the record, were for money advanced and upon valuable consideration. After these transactions, and before the issuing of any execution, there was a settlement of accounts between May and his father-in-law Meredith, and a bill of sale executed by the former to the latter for the slaves which May had received as a marriage portion with the daughter of Meredith. There is no evidence to oppose the fairness of this transaction. It further appears that there was a considerable balance still due from May to Meredith. If this property were his own, he cannot be placed in a worse situation than if it had remained in this State. Will the removal of his own property compel him to pay more than his just proportion as a co-security?
I come now to the 3d point, on which I principally rely; and will shew the propriety of the interference of a Court of Equity. There was a suit commenced in the District Court of Prince Edward by Johns against Peter May and his securities, for defalcations by May, while he acted as the deputy of Johns. The matters in controversy were referred to arbitrators, who found it difficult to separate the particular causes of action in this suit, from those which produced the judgments in the Court of Buckingham, obtained by motion in behalf of Johns against his deputy May and his securities. They, therefore, *took a view of the whole transactions of Peter May, from the commencement of his sheriffalty to its close: the result of which was that Peter May was a delinquent for 1031. 0s. 9d. only; and William May, as sub-deputy, was delinquent upwards of 5001. William May was as much the deputy of the high sheriff as Peter, but his transactions were confined to the District of Peter May alone, by his consent and that of the high sheriff. The record shews that William May qualified as deputy at the instance of the high sheriff; and moreover that Peter May gave bond, with new security, for the faithful performance of the *262 duties of his office. We contend, therefore, that for the transactions of William May, the first securities of Peter are not liable. Not a cent of the money paid by Benning' was on account of the defalcation of Peter May, but of William only: for the securities of Peter had already paid more than he was in default. If the high sheriff admits an additional deputy to act, and takes security for his conduct, he takes the responsibility on himself, and discharges the securities of his first deputy. This is a thing of personal trust and confidence, and the securities enter, purely on the ground of a knowledge of the deputy. Would it not be unreasonble, when the securities of Peter May had confidence in him alone, to permit the high sheriff to introduce William May, in whom they might have no confidence, and charge them with his transactions? But why did the high sheriff ask for further security, if he thought the former securities of Peter May were bound?
If the report of the referees be correct, we are clearly exonerated. Johns refers to this very report and makes it a part of his answer; Benning also refers to Johns’ answer and makes it a part of his. But it will be argued that this case is forever closed by the judgments at law. Can this be true when the parties themselves refer to the report of the referees. They, therefore, completely open the case to the interference of a Court of Equity. Suppose there had been as many verdicts in an action of debt upon a bond as the law would allow, would not a Court of Equity interfere, if it appeared that the money was not due? So in this case, we have been sued for removing property which was our own, and judgment has been obtained for a sum much larger than we were on any principle bound to pay.
But how can it be accounted for, that the verdict was for the whole debt, against one security who was only bound with others? Is there any principle of law or equity *which will justify this verdict? If the Court should think that we are bound at all, it can only be for our .proportional part. No damages can be demanded by Benning for any sacrifices which he may have made in raising money to pay the debt for which he was bound as the security of Peter May. The case of Halcomb v. Elournoy (a) settles that question. The most that can be said is, that Meredith is bound for one third of 3181. 18s. which appears to be the whole sum paid by Benning.
It will appear at’ the first view that the object of Meredith in removing his property was not to avoid the payment of his just proportion. Before he removed any of his property, he sent to Johns and offered to pay his full proportion, if he would exonerate him from the residue. The only deposition which goes to call in question the integrity of Meredith, is that of William May; but two other witnesses prove the disposition of William May towards Meredith ; and there are circumstances which shew that no attention should be paid to it. He says that the negroes of his father Charles May were brought to the house of Meredith, and that he was very active in conveying them out of the State. Now, is. it probable that Meredith, who was apprehensive that he should have the whole debt to pay, would be assisting in carrying the slaves of one of his co-securities out of the State? But there is other evidence which shews, that it was with great reluctance Meredith could be prevailed on to take any of his property out of the State. He was placed in this situation: one of his co-securities, Charles May, was carrying his property out of the State; Benning, the other security, was the relation of Johns, who refusing any terms of accommodation, he was still more apprehensive that he; should have the whole debt to pay. But after his return, and when his property was out of the reach of the law, he still made a proposition to Johns to pay his full proportion. Under these peculiar circumstances his character cannot be impeached for wishing to avoid the payment of more than his just proportion.
Upon the whole view of the case Meredith has been an injured and an oppressed man. There has been a verdict against him for 5001. when not more than 1061. were due.
Wickham, for the appellee. Mr. Stuart has certainly done justice to the cause oir his client, so far as it respects the points, which he has thought proper to submit to-the consideration of the Court: but the counsel on the other *side must know that if they expect to gain the cause, it must be on points which have not yet been made. Admitting every position to be correct as stated by Mr. Stuart; the question still occurs, how is this Court to' say that the Chancellor did wrong in dismissing the appellant’s bill? This was a plain action at law ; the foundation of which, was the appellant’s assisting a public defaulter in removing his property out of the State, and'thereby subjecting the appellee, who was his security, to the payment of a considerable sum of money. Mr. Stuart supposes that this action is not maintainable. But if this objection lay, if the action cannot be sustained, is a Court of Equity to sit to correct the errors of a Court of Law? If the action were not sustainable, why did not the defendant move in arrest of judgment, or sue out a writ of error? The District Court did think the action maintainable: for theyr rendered judgment on the verdict of the Jury. The Judges were applied to for a new trial; they had the case a day under consideration, and rejected the application.
This cause has been taken up as if it were of the first impression, and has been argued as if it were now before a Jury'. The attention of this Court sitting on am appeal from a decree of the Chancellor, has been drawn to points which were or might have been submitted to the District Court, of common law jurisdiction. After all those things had appeared before the Court of Law, the defendant filed his bill in equity, and insisted that the plaintiff at law was bound to answer. What did the Chancellor do? He granted a new trial. It was an action of tort, not a case of mere equitable jurisdiction. If the Court of Chancery could, with propriety, interpose, it did all *263 that could be done, which was to grant a new trial: and what could this Court do were it to interpose? — surety it could only grant a new trial! — The Chancellor did grant a new trial, though there was nothing in the record to warrant it; the parties were again fully heard, and there was another verdict for the appellee.
This has been likened to the case of Hal-comb v. Flournoy; but it is totally dissimilar in every feature. I hold it to be clear law, that if A. be indebted to B. let B. be put to ever so much trouble in getting his money, the principal and interest is the only measure of damages, because it sounds in contract; but if A. be indebted to B. and C. a third person interfere in transferring the property of A. out of the reach of the law, it is a question for *'the consideration of a Jury what damages they will give for the real injury sustained.
It is said that Benning had no cause of action, because he had not, in fact, paid the money. This is a question which it is unnecessary to inquire into, in a Court of Equity. Benning had been indulged by the General Assembly; and probably gave new security; the debt was, therefore, his own. It is no ground for the consideration of a Court of Equity, that the party had no cause of action when he commenced his suit, if, at the time of the judgment, he had a right. A Court of Eaw might be bound to turn the parties round, but not a Court of Equity.
But we are asked — can a man be prosecuted for carrying his own property out of the State? — I answer, no; if there be no fraud: but if it be for a fraudulent purpose he may be prosecuted. Whether the property of Peter May was fairly acquired by Meredith was a question proper to be submitted to a Jury. We must presume that there was evidence before the Jury to satisfy them, that the transaction was not a fair one. The Jury did not decide on affidavits, as a Court of Equity must do, but determined after hearing the viva voce testimony, and weighing the credibility of the witnesses. There was no motion to the District Court to certify that the verdict was against the weight of evidence, and this verdict weighs against all the testimony which can be adduced. The Chancellor, notwithstanding those verdicts, referred the accounts to a commissioner, who made a report; and reported correctly if it were a mere matter of account, if no damages were to be given for the intromission of a third person to defraud a just creditor.
The transaction between Peter May and Meredith was fraudulent upon the face of it. After Peter May had become a defaulter as a deputy-sheriff, then the debt for the land was for the first time thought of. There was no deed, no mortgage, no bond; nothing to shew the transaction. And after Peter May was indebted largely for the land, Meredith still gives him eight negroes. Is this presumable? He trusts this man, without a scrip on paper, for a large tract of land, and then gives him so many negroes, without any security for either. This case is clearly against Meredith if it be necessary to look into it; but it has been forever closed by the verdict of the Jury.
But we are told there was a reference of a subsequent suit brought by Johns against Peter May and his securities, and it appears that Benning has recovered of Meredith *more than Johns was entitled to. Did that affect Benning? Did it prevent him from bearing the whole burthen of the debt? Counsel have considered Meredith simply as a co-security. This is not correct. The Jury considered him as a man fraudulently assisting another to evade the law. Johns bringing his action against Peter May and others his securities, it was the duty of May to have defended the suit and to have shewn what was realty due. Can Peter May now come forward and say too much was recovered by Johns? Under the circumstances of this case, any man assisting May to secrete his property was unquestionably liable to Meredith for damages. Whether any thing was due to Johns or not, was of no importance.
The permission of Johns to introduce William May as the assistant of Peter, cannot vary the responsibility of the latter; for he would have been liable for the taxes within his District whether he had collected them or not. But it is altogether a mistake in point of fact, that Peter May and his securities were made liable for the conduct of William. The judgment which Benning had to pay, was for the taxes of 1784 collected by Peter May exclusively, before William was admitted his security, who did not qualify till 1785. The award of the arbitrators made in the subsequent suit of Johns against Peter May and his securities embraced the taxes of 1785, and other defalcations of Peter May. The referees state, that after Benning had paid all the judgment first mentioned, he owed Johns on account of the other deficiencies of Peter May, the sum of 1031. being his proportional part.
But, says Mr. Stuart, there is no principle of law or equity which could make Meredith liable for more than his proportion, as a co-security. It is admitted by us, that he was not more liable for being security; but he was liable for the fraud. This was collateral to his securityship. Surety they must admit that he is not the less liable on that account.
As to the character of Meredith, I am willing to admit that, in private life, he is a respectable man ; but there is such a thing as fraud in a technical sense. It is not so clear, however, that Meredith acted correctly. Peter May was an insolvent debtor; Meredith takes his property and that of Charles May and conveys it off. What is the consequence? Benning was compelled to pay the whole debt, instead of his just proportion. But Meredith offered to pay his proportion to Johns! — Was Johns bound to receive *it? No. Because Meredith was liable for the whole. How often does it happen that a security would be very glad to get off by paying his proportion of a debt! But by what rule of morality did Meredith suffer Benning to be ruined? He might have deposited his third part for his use, if Johns had refused to receive it. But, in truth there is nothing *264 in the record which warranted the interposition of a Court of Chancery in the first instance.
Hay and Randolph, in reply, argued on the supposition that the Jury in awarding damages to Benning in his action against Meredith, had considered it a mere matter of account, and not a question of fraud, on an action sounding in damages. They undertook to shew that Benning had recovered of Meredith a much larger sum than was due from Peter May to Johns; and inferred from thence, that if this fact had been known to the Jury, they never would have given such excessive damages against Meredith. They also contended that Meredith was entitled to the interposition of a Court of Equity, because his counsel, confident in the success of his cause, from the weakness of the testimony brought forward against him, had failed to exhibit evidence in their power, shewing that the slaves carried to North Carolina were, in truth, his own property; that the balance due from Peter May to Johns arose from the defalcations of William May, who was admitted a sub-deputy of Peter’s by Johns, and for whose conduct the first securities of Peter were not responsible: and that the award of the arbitrators in the suit of Johns v. Peter May and his securities, proved clearly, that there was not so much due from May to Johns, as had been recovered by Benning of Meredith.
JUDGE TUCKER. — This was an action for a tort, brought by the appellee Benning against the appellant, in which the former obtained a verdict against him for 5001. for secretly and maliciously taking and carrying away the slaves and other property of one Peter May (against whom he had lawful cause of action) to parts unknown, and for still keeping, secreting, and concealing them, and also for aiding, assisting, • and counseling the said Peter May in removing himself to parts unknown, to the end that the plaintiff might be prevented from recovering against him; with an averment that by such removal of the property, and of the said Peter himself, to parts unknown, the ^plaintiff has been prevented from recovering his demand of S001. to his damage 7001.
To the judgment rendered in this suit, the appellant obtained an injunction, on a suggestion that he was the real owner of the slaves removed, and not Peter May— and further suggesting a variety of matter with a view to shew that Benning’s demand against Peter May was overrated by the Jury, and the damages excessive — but not charging any surprise at the trial, nor denying that part of the charge in the declaration, which relates to the concealment of Peter May’s own person, or of his other property, except the slaves. The Chancellor directed a second trial to be had, when the jury found a verdict for 47S1. 6s. 8d. and after some further proceedings in the Chancery Court, not material to my view of the case, dismissed the bill.
The District Court before which the first trial was had, was moved for a new trial, and after taking time to consider of the motion, overruled it — after which, the appellant applied for and obtained his injunction.
Courts of Common Eaw have been with reason very reluctant in grantng new trials merely on the ground of excessive damages, in actions founded upon a tort; unless there had been some allegation of surprise upon the party, or some misconduct on the part of the Jury. Nor have they of late years in England granted them, without hearing the report of the Judge who presided at the trial. In this case, the Judges who did preside, and hear the evidence, were moved for a new trial, and refused it. No exception was taken to any opinion of the Court upon the trial, nor was any offered to that overruling the motion. This may be considered as equivalent to the report of the Judge, and a decision at bar on a motion for a new trial. The interposition of a Court of Equity after such proceedings had, is, I believe, without example in that country from which we have borrowed our system of jurisprudence, however frequent here, of late years. That such an interposition may sometimes be necessary and proper, especially after trials in the inferior Courts I am not disposed to deny. But where the Judges of a Superior Court have presided on a trial, and have on mature deliberation refused to grant a new trial, it would seem to me that the interposition of a Court of Equity should be sparingly administered, unless for some reason which evidently could not have been submitted to the consideration of the Court refusing the new trial. And after the solemn *decisions of this Court in the cases of Maupin v. Whiting, and Terrel v. Dick, (a) in the former of which, it was decided that, where the defence is purely legal, it should be made on the trial at law; and in the latter, that, after a cause has been once fully decided at common law, equity ought not to interpose; in both which decisions I most heartily concur; we may hope that the line of demarcation between the two jurisdictions will be more attended to.
The defence in the present case was such as might, and probably was, made at law on the first trial. The papers described by Mr. Venable in his deposition, with which Meredith furnished his counsel, were probably kept back from the conviction which they felt that those papers were either iuad-missible, or unimportant. Andas far as I can judge of the contents of them from their titles, I am of the same opinion. The gist of the action was for the maliciously aiding Peter May to remove himself and his property to parts unknown to the plaintiff, to the end that the plaintiff might be prevented from recovering the money he had been compelled by a legal judgment to pay for him. The tort was not confined to the removal of his slaves, or other property: it is expressly charged that he aided, assisted, and counselled him to remove himself as well as his property; and that he did this maliciously with a view to deprive the plaintiff of his legal remedy against him. The whole charge was put in issue by the plea of not guilty. — The Jury have found the malice and the intent, as well as the *265 facts both with respect to his person, and his property. A case more properly belonging to the determination of a Jury cannot easily occur — they had a right to make -the plaintiff a full compensation for all the inconvenience and expense he had been put ■to by the defendant’s malicious conduct. For in matters of tort the Jury have a right, if they see proper, to give vindictive damages. The case of Halcomb v. Flournoy, (a) is altogether different; it was an action of debt, not an action founded on a tort. But even in that case a majority of the Court thought that the award of the arbitrators, who were jurors of the parties’ own choosing, ought to be sustained, notwithstanding the damages awarded might have been given in consideration of injrry sustained beyond the principal and interest of the money actually paid. This I think is evident from the award itself; the arbitrators declaring that it appeared to them that the plaintiff had been put to very great trouble and expense by travelling to and from Richmond, and that *his negroes had been taken in execution to satisfy the judgments against hirn, and were kept out of his possession and service at various times, from which he sustained losses. If the Jury in the present case have exceeded the exact measure of principal and interest paid by Benning, we are to presume that they had sufficient evidence before them to satisfj' them that he had sustained injury beyond that measure, and that the Court also was satisfied on the same point. The second Jury gave a verdict for the same sum within 251. which shews they xwobably proceeded on similar grounds. Such a concurrence ought to have satisfied the Court of Chancery that the first verdict was not unreasonable — I therefore think the dissolution of the injunction, and the final dismission of the bill was perfectly right, and that the decree ought to be affirmed.
JUDGE ROA Nil.
It does not satifac-•torily appear from the report of the referees, (Woodson and others,) or from any other testimony in the cause, that the monej' recovered from Peter May and his sureties, in June, 1788, was not due by him to his principal. All the defendants were notified of the motion, and this ground of defence was not taken by any of them; but the judgment was acquiesced in. Notwithstanding this judgment, all the securities were safe, as long- as Peter May himself had property adequate to the payment of the debt, and within the reach of the process of the Court. Benning, fearing that the whole, or greater part of the debt would fall on him, in consequence of the eloigning of May’s property, brought his action against Meredith for assisting in carrying away and secreting the property. This action, though in form, an action of tort, was, in respect of damages, to be regulated by the actual injury sustained, or liable to be sustained; and if it now clearly appeared that this limit was exceeded by the verdict, I will not say but that that verdict should be pared down to the proper standard. It was not an action sounding merely in damages, but one in which a just criterion was afforded, whereby the damages should be estimated.
The injury complained of in the action in Prince Edward District Court was, that, whereas P. May had property amply sufficient to pay the whole debt, and thus secure Benning from all loss whatsoever, this property was eloigned by the defendant Meredith, and Benning made liable, in the event of his co-securities’ insufficiency, to pay the whole sum due on the judgment in question, as well as other sums for which P. May should be found *to be liable. Admitting that the damages recovered by Benning do not exceed what he has paid, and is liable to pay, on account of his suretyship for May, the effect of the judgment against Meredith is to place him (Benning) in the same situation as if May’s property had never been removed, and was sufficient to pay all his debts as sheriff, for which Benning was liable. It substitutes Meredith, in lieu of May, in standing between Benning and loss. It admits that May had property enough to effect this object, and that Meredith by his act has made the debt his own.
It would be entirely inconsistent with this idea to divide this debt between Benning and Meredith, and make Benning subject to some loss; for the Jury were satisfied when they rendered their verdict, that Benning should be subjected to no loss whatever. Notwithstanding the deposition of one of Meredith’s counsel in the action at law; as a motion for a new trial was made and overruled, and no exception taken, we must conclude that enough was proved in the action to support the verdict. It would be a dangerous proceeding for us to open a verdict, on the ground of a de-fence which was known but not used in the trial at law; I here allude to the appellant’s claim of property in the slaves removed.
But however it was in the first trial, the appellant might have used this defence in the trial of the issue in the District Court of Richmond. He either did not then use it, (and, if so, his omission makes against him in the present case,) or if he did, that defence was reprobated by the Jury, (who are the best judges of credibility,) on a full consideration of the testimony in the cause; and this last verdict, concurring with the first, would seem conclusive on the point.
The question then recurs, is John Ben-ning placed in abetter situation by the last verdict, that if P. May’s property had been sufficient for his indemnification, and had never been eloigned? The report of the commissioner shews that, on the 22d of September, 1802, Benning had paid (including the judgment of 1793, for 1031. Os. 9 l-2d. and interest on both judgments,) 6021. 4s. 7d. — If the sum paid with interest on account of the last judgment be deducted, he will have paid about 5101. ; and that solely on account of the first judgment; without taking into account the sums which he alleged (and which he may have proved to the Jury) that he was compellable to pay to private individuals; or taking into account his possible’ liability to divide with Charles May the sum which he (May) has been ^compelled to pay, on account of that judgment, or other judgment against P. May. Even this last sum, *266 standing singly, exceeds the amount of damages assessed by the Richmond Jury, if we were even to add thereto interest up to the date of the commissioner’s report. We cannot, therefore, without entirely losing sight of the ground of the action in Prince Edward District Court which went to an entire indemnity of Benning, and to place him in the same situation as if P. May’s estate was yet amenable to the judgments against him, and sufficient to satisfy them, subject Benning to any abatement of the sum recovered by the verdict of the Richmond Jury. Meredith therefore must stand, where the Jury of Prince Edward has placed him, as interposing between the surety and P. May, and subject to the estimated damages arising from his misfeasance in the instance in question. He does not stand in this case in the light of a security, and as having a claim to contribution from his co-securities; but is to retribute to Benning that injury which he has actually sustained by means of his (Meredith’s) conduct in relation to May’s negroes. Benning therefore is to be protected from all loss on account of P. May’s default in the present instance, within the limits of the sum found by the Jury, and is not to divide with Meredith the sum actually paid for P. May.
My opinion is that the decree is right and should be affirmed.
JUDGE FLEMING.
— This being originally a special action for a tort committed by the appellant, Meredith, in secretly and maliciously taking and carrying to parts unknown the property of Peter May, deputy sheriff of Buckingham County, against whom the plaintiff Benning had a legal claim as one of his securities; and also for counselling and assisting the said' Peter in removing himself to parts unknown, whereby the said plaintiff was prevented from recovering indemnification of the said Peter; it appears to me that an inquiry, after the verdict, into the accounts between Johns, the high sheriff, his deputies and their securities, and whether Peter May was responsible for the malfeasance of William May, another under sheriff, was improper, as the whole matter was probably, or might have been before the Jury on the trial at law: the result of which was a verdict for 5001. damages; and a motion for a new trial to the Court that heard the whole evidence, was overruled, after time had been taken to consider the ^motion; from which circumstance it is to be presumed that the Court was satisfied the verdict was neither contrary to evidence, nor the damages excessive.
The defendant Meredith, however, on a suggestion of surprise at the trial, and stating in his bill sundry matters respecting the original controversy, obtained an injunction in the High Court of Chancery, which, after several interlocutory orders, directed a new trial of the issue at law, which was had before the District Court of Richmond: where there was no suggestion of surprise on the part of the defendant; and there, the Jury, who were the proper judges of the facts proved by the evidence, and of the measure of damages to be given thereon, assessed the damages to 4751. 6s. 8d.
This verdict being reported to the High Court of Chancery, a commissioner was directed to report an account of the sum due from Peter May to Johns the high sheriff, and of the payments made by the sureties respectively: on which report it appeared that Benning was a creditor for payments to the amount of 6021. 4s. 7d. ; whereupon, on a final hearing of the cause, the plaintiff’s bill was dismissed with costs; which, as the controversy between Benning and Meredith was not a matter of account, but simply an action for damages for a tort, ought, in my conception, to have been done without reference to a commissioner.
It is a difficult matter to draw the true line between the jurisdiction of Courts of Law and Courts of Equity; but there is a well-settled general principle, which admits of but few exceptions; that, where a person, seeking a right, has a complete remedy at law, he shall not go into a Court of Equity to obtain it; so on the other hand, where a defendant, in an action at law, has a full and complete defence in his power, and neglects to avail himself of it, he shall no t go into a Court of Equity for relief; and, therefore, Courts of Equity should be cautious in granting injunctions to judgments fairly obtained at law. The great disproportion between the number of those that are dissolved and of those that are made perpetual verifies the position.
I am, in this case of opinion with the other Judges that the decree, dismissing the bill with costs, is correct, and ought to be affirmed.
By the whole Court (consisting of JUDGES FLEMING, ROANE and TUCKER) the decree of the Chancellor was affirmed.

 2 Call, 433.

 1 Call. 224 and 546.

 2 Call, 433.